**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF ANIMALS<br>777 Post Road, Suite 205<br>Darien, CT 06820<br><br>Plaintiff,<br><br>v.<br><br>HOWARD LUTNICK, in his official capacity as Secretary of Commerce, United States Department of Commerce<br>1401 Constitution Ave, NW<br>Washington, DC 20230<br><br>EUGENIO PIÑEIRO SOLER, in his official capacity as Assistant Administrator of the National Marine Fisheries Service<br>1315 East-West Highway<br>Silver Springs, MD 20910, and<br><br>NATIONAL MARINE FISHERIES SERVICE, an agency of the United States<br>1315 East-West Highway<br>Silver Springs, MD 20910<br><br>Defendants. | Civ. No. ________________ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Plaintiff, Friends of Animals, brings this action against Defendants Howard Lutnick, in his official capacity as Secretary of Commerce; Eugenio Piñeiro Soler, in his official capacity as Assistant Administrator of the National Marine Fisheries Service (also referred to as "NOAA Fisheries"); and the National Marine Fisheries Service (collectively, "NMFS"), for their unlawful negative 90-day finding and corresponding decision to not

undertake a 12-month status review of the Atlantic horseshoe crab (*Limulus polyphemus*) ("horseshoe crab") under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

2. The horseshoe crab is a marine arthropod found along the Atlantic coast, including from northern Maine to Florida, the Gulf coast from Florida to Louisiana, and the coast of the Yucatán Peninsula. These marine animals have existed for approximately 445 million years, well before the dinosaurs roamed the earth.

3. The horseshoe crab is a keystone species critical to the survival of many other species in marine and terrestrial food webs, including species of migratory shorebirds, finfish, and turtles.

4. However, populations of this so-called "living fossil" have sharply declined and face multiple threats to their continued survival, including exploitation by the commercial bait and biomedical industries, coastal development, shoreline alteration, climate change-associated sea-level rise, erosion of habitat, marine life collection, bycatch, impingement on coastal infrastructure, and pollution events. Species that rely on horseshoe crabs, including federally listed rufa red knots and loggerhead sea turtles, have declined along with the horseshoe crab.

5. Due to the threats to the horseshoe crab and resulting population declines, and the lack of adequate existing regulatory mechanisms to address them, Friends of Animals and the Center for Biological Diversity submitted petitions (hereinafter, "the Petitions") to NMFS to list the horseshoe crab under the ESA.

6. On February 18, 2026, NMFS denied the Petitions. The agency published in the Federal Register a finding that "the petitions do not present substantial scientific or

commercial information indicating" that listing the horseshoe crab under the ESA may be warranted. 91 Fed. Reg. 7448 (Feb. 18, 2026).

7. The ESA mandates that the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service as its delegate, make a preliminary determination as to whether one or more petitions contain substantial scientific or commercial information indicating that listing **may be** warranted. 16 U.S.C. § 1533(b)(3)(A). If the petitions do not present such information, NMFS makes what is known as a negative 90-day finding. If the petitions do present such information, NMFS must make what is known as a positive 90-day finding. Only after a positive 90-day finding does NMFS commence a full scientific review of the species' status, resulting in what is known as a 12-month finding. The 12-month finding is a determination, made based on the best available scientific or commercial information and after consultation with interested parties and government agencies, whether the petitioned action **is** warranted.

8. Here, NMFS effectively commenced a 12-month review to make a 90-day finding, but without the associated procedural opportunities for input from all interested parties. The resulting negative finding for the horseshoe crab violated the ESA, as it was arbitrary, capricious, an abuse of discretion, contrary to law, and undertaken without observance of required procedure under the Administrative Procedure Act's (APA) standard of review. 5 U.S.C. § 706(2). Specifically, the agency (1) arbitrarily applied an improperly heightened evidentiary standard, including by picking and choosing among scientific sources and information, arbitrarily discounting, dismissing, disregarding, or ignoring substantial information in the Petitions, and requiring conclusive scientific proof that listing is warranted; (2) made conclusions unsupported by the evidence; (3) relied on

information, including subsequently produced information, outside the four corners of the Petitions; and (4) failed to properly consider whether the horseshoe crab is threatened or endangered over a significant portion of its range.

9. Friends of Animals challenges NMFS's unlawful finding that the Petitions did not provide substantial information indicating that listing the horseshoe crab as threatened or endangered may be warranted, and the resulting failure to undertake a status review of the species.

10. NMFS's failure to fulfill its duty under the ESA places horseshoe crabs in further peril, subjecting them to continued human exploitation and possible extinction.

11. To remedy NMFS's violation of law, Friends of Animals seeks declaratory and injunctive relief. Friends of Animals asks this Court to declare that Defendants have violated the ESA and seeks an order vacating the negative 90-day finding and requiring that NMFS continue what it started and initiate a full 12-month status review. Alternatively, Friends of Animals asks this court to order NMFS to make a new 90-day finding that applies the proper standard within an expeditious timeframe.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346(a)(2) (claims against United States), 28 U.S.C. §§ 2201–2202 (declaratory judgments and relief), 16 U.S.C. § 1533(b)(3)(C)(ii) (negative 90-day findings subject to judicial review), 16 U.S.C. § 1540(c) (district court jurisdiction), 16 U.S.C. § 1540(g)(1)(C) (action arising under the ESA citizen suit provision), and 5 U.S.C. §§ 702–704 (APA).

13. This Court has authority to grant Friends of Animals' requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief), 16 U.S.C. § 1540(g)(1) (ESA citizen suit), and 5 U.S.C. § 706 (APA).

14. Pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), Friends of Animals sent Defendants notice of its intent to sue ("Notice") on June 18, 2026. *See id*. § 1540(g)(2)(C).

15. As of June 25, 2026, all Defendants received Friends of Animals' Notice.

16. More than 60 days have passed since Defendants received Friends of Animals' Notice. *See* 16 U.S.C. § 1540(g)(2)(C).

17. Defendants have not remedied their violations of the ESA. Therefore, an actual controversy exists between the parties.

18. Friends of Animals has no other adequate remedy at law to redress the violations noted above.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A) because a defendant resides in this judicial district and the violation giving rise to Friends of Animals' claims occurred in this judicial district.

**PARTIES**

20. Plaintiff, FRIENDS OF ANIMALS, is a not-for-profit international advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human animals, both free-living and domestic. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing

these issues though its magazine called *Action Line*, its website, and other reports. Friends of Animals has published articles and information advocating for the protection of horseshoe crabs so that they can live unfettered in their natural habitats. In the absence of protection under the ESA, horseshoe crabs are subject to exploitation, habitat loss, bycatch, and other human pressures that threaten their continued survival. Defendants' failure to conduct a lawful 90-day finding on the Petitions to list the horseshoe crab under the ESA injures Friends of Animals' members and staff.

21. Friends of Animals sues on behalf of the organization, adversely affected members, and staff. Friends of Animals invests time and resources to protect horseshoe crabs, including advocating for the conservation of the species and for the listing of horseshoe crabs as threatened or endangered under the ESA. In addition, Friends of Animals works to educate its members and the public about the status of the species and the threats it faces.

22. Friends of Animals has members and staff who live near or frequently visit horseshoe crab habitat. They visit beaches to search for and observe horseshoe crabs, and have scientific, recreational, educational, conservation, and aesthetic interests in the existence, observation, and study of these animals.

23. The recreational, educational, scientific, aesthetic and other interests of Friends of Animals, their members, and staff have been and are being adversely and irreparably injured by Defendants' violations of the ESA and its implementing regulations. A species does not receive any protection under the ESA until it is listed as endangered or threatened. Without ESA protection, the horseshoe crab is likely to continue its decline. These are actual, concrete injuries to Friends of Animals and its members and staff, caused

by Defendants' failure to comply with the ESA. Friends of Animals' injuries will continue unless this Court grants the relief requested in this complaint.

24. Defendant HOWARD LUTNICK, in his capacity as Secretary of Commerce, has ultimate responsibility for ensuring lawful implementation of the ESA with respect to marine species such as horseshoe crabs. This includes listing threatened or endangered marine species such as the horseshoe crab under the ESA. The Secretary is also responsible for the actions of his delegate, NMFS, including that delegate's failure to conduct a lawful 90-day finding. Friends of Animals sues Defendant Lutnick in his official capacity.

25. Defendant EUGENIO PIÑEIRO SOLER, in his capacity as Assistant Administrator of NMFS, is responsible for implementing, administering, and complying with the ESA with respect to marine species such as the horseshoe crab. Plaintiff sues Defendant Piñeiro Soler in his official capacity.

26. Defendant NATIONAL MARINE FISHERIES SERVICE is a federal agency within the National Oceanic and Atmospheric Administration (NOAA), Department of Commerce. NMFS is responsible for the conservation of the nation's living ocean resources and the marine habitats on which they rely. The Secretary of Commerce has delegated to NMFS his responsibilities to administer the ESA for marine species. This complaint refers to all Defendants collectively as "NMFS."

## STATUTORY AND REGULATORY FRAMEWORK

### A. The Endangered Species Act

27. The purposes of the ESA are "to provide a program for the conservation of . . . endangered and threatened species" and to "provide a means whereby the ecosystems

upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

28. The listing process is the essential first step in the ESA's system of species protection and recovery. Before the ESA can protect a marine species facing extinction or that species' habitat, the species must be listed as either endangered or threatened. *See* 16 U.S.C. § 1533(a), (c). Under the statutory definition, a species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" under the statute if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

29. NMFS must list a marine species under the ESA if it is threatened or endangered by any one or more of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1); 50 C.F.R. § 424.11(c).

30. Any interested person can initiate the listing process for a marine species by petitioning NMFS to list a species. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

31. Upon receipt of such a petition, NMFS is required, to the maximum extent practicable within 90 days, to "make a finding as to whether **the petition** presents substantial scientific or commercial information indicating that the petitioned action **may**

**be** warranted." 16 U.S.C. § 1533(b)(3)(A) (emphasis added). This preliminary finding is known as a "90-day finding" and must be promptly published in the Federal Register. *Id*.

32. Pursuant to NMFS's regulations, a petition is deemed to contain "substantial scientific or commercial information" if it contains "credible scientific or commercial information in support of the petition's claims such that a **reasonable person** conducting an impartial scientific review would conclude that the action proposed in the petition **may be** warranted." 50 C.F.R. § 424.14(h)(1)(i) (emphasis added).

33. Under this low threshold standard, NMFS must accept credible, scientific information that supports the petitioned action. Only information that is "incorrect, unreliable, obsolete, or otherwise irrelevant to the requested action" can be discounted or dismissed. 91 Fed. Reg. 7448, 7449. Therefore, NMFS should not "subject the petition to critical review." 71 Fed. Reg. 66298 (Nov. 14, 2006).

34. "[A] petition need not establish a 'strong likelihood' or a 'high probability' that a species is either threatened or endangered to support a positive 90-day finding." 79 Fed. Reg. 4877, 4878 (Jan. 30, 2014). Thus, conclusive evidence regarding the need for listing is not required and "where there is disagreement among reasonable scientists, the Service should make the 'may be warranted' finding." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 106, 109-110 (D.D.C. 2018) (quotation omitted).

35. In evaluating a petition to list a species, NMFS must consider whether the petition contains substantial information indicating that the species may be threatened or endangered throughout all of its range or any significant portion of that range. 16 U.S.C. § 1532(6), (20).

36. "If **such a petition** is found to present such information, [NMFS] shall promptly commence a review of the status of the species concerned." 16 U.S.C. § 1533(b)(3)(A) (emphasis added). As part of that review process, NMFS must solicit additional information and comments from all interested parties. *Id.*; 50 C.F.R. § 424.15. At that time, NMFS must also send notice in writing to state agencies in any affected states. 50 C.F.R. § 424.15.

37. NMFS has 12 months from the date the petition was received to conclude its status review and make one of three findings: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action is warranted but presently precluded by other pending proposals to list species, provided that NMFS is making expeditious progress in listing those other species. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(h)(2). This second finding is known as a "12-month finding" and must be published in the Federal Register. *Id.*

38. If NMFS' status review leads to a 12-month finding that the petitioned action is warranted (a "positive 12-month finding"), then the agency must publish a proposed rule to list the species as endangered or threatened in the Federal Register. 16 U.S.C. § 1533(b)(3)(B)(ii). Within one year of publishing a proposed rule to list a species, NMFS must make a final decision on the proposal, *id.* § 1533(b)(6)(A), or extend the deadline by up to six months in cases of scientific uncertainty. *Id.* § 1533(b)(6)(B).

39. Negative 90-day findings and both negative and positive 12-month findings are subject to judicial review. *Id.* § 1533(b)(3)(C)(ii).

40. The ESA requires the Secretary to designate critical habitat for all threatened and endangered species concurrently with their listing to the maximum extent prudent and

determinable, and to subsequently develop recovery plans for such species. 16 U.S.C. § 1533(a)(3), (f).

41. The ESA makes it unlawful for any person to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect a listed species, or attempt to engage in any of the foregoing actions, unless the action is specifically permitted by a special rule or permit issued by the Secretary. *Id*. §§ 1538–39.

42. The ESA also requires that all federal agencies "carry out programs for the conservation" of threatened and endangered species and consult with the Secretary to ensure that their actions are "not likely to jeopardize the continued existence" of such species or "result in the destruction or adverse modification" of their critical habitat. 16 U.S.C. § 1536(a)(1), (2).

**B. The Administrative Procedure Act**

43. Under the APA's standard of review, a court must "hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). This standard of review applies to claims brought under the citizen suit provision of the ESA.

44. Agency actions, findings, and conclusions are arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTS GIVING RISE TO FRIENDS OF ANIMALS' CLAIMS

### A. Atlantic Horseshoe Crabs

45. The Atlantic (or American) horseshoe crab, *Limulus polyphemus*, is the only extant horseshoe crab species native to the Atlantic coast of North America. Horseshoe crabs are benthic animals that live on or just beneath sandy or muddy substrates in shallow coastal waters, estuaries, and offshore habitats near the continental shelf. They are marine arthropods more closely related to spiders, scorpions, and ticks than to true crabs.

46. Adult horseshoe crabs have a distinctive horseshoe-shaped, hard exoskeleton (carapace) that is typically olive green to dark brown. The body can range in length from 3.5 to 33.5 inches and consists of three primary sections: the prosoma (head), opisthosoma (abdomen), and telson (tail).



Credit: Wikimedia Commons

47. Horseshoe crabs generally require 9 to 11 years to reach sexual maturity. During the spring, particularly around high tides associated with new and full moons, adults migrate to sandy beaches to spawn. Female horseshoe crabs are larger than males and deposit clusters of eggs in nests excavated in the sand. A single female may lay tens of thousands of eggs during a spawning season, with the number of eggs largely depending on the size of the crab. Males use specialized legs with claws to grasp females as they migrate onto beaches and externally fertilize the female's eggs after they are deposited.

48. Horseshoe crabs play an important ecological role. They primarily feed on invertebrates such as marine worms, small mollusks, and crustaceans, and are prey for various marine species such as sea turtles, fish, sharks, and shore birds. The eggs of horseshoe crabs provide an essential food resource for numerous species of migratory shorebirds, including the ESA-listed rufa red knot. Red knots and other shorebird species time their migrations to coincide with horseshoe crab spawning so they can feed on the abundant eggs to fuel their long trip to Arctic breeding grounds.

49. In the 1990s, the numbers of horseshoe crabs declined sharply in Delaware Bay, the region with the highest concentration of the crabs, due to industrial exploitation. Horseshoe crabs were, and continue to be, killed for use as bait for eel and whelk fishing, and harvested to collect their blood for biomedical testing. Other populations along the Atlantic Coast have experienced similar declines.

50. Spawning of horseshoe crabs, and consequently egg densities on beaches, has also fallen drastically. In 1990, 1.24 million horseshoe crabs spawned in Delaware Bay on the peak spawning night (already down from over 4 million annually in the 1870s); in comparison, in 2000, only 272,770 crabs spawned on the peak spawning night. In 2021,

spawning remained low at 402,970 crabs. Since the 1980s, egg densities on Delaware Bay beaches have fallen by more than 90% and remain at these dire levels today. Similar declines in egg abundance have been documented in South Carolina.

51. In addition to the ongoing threat of industrial harvest, horseshoe crabs are losing spawning habitat due to shoreline alteration, coastal development, erosion, and sea-level rise associated with climate change. Bycatch, impingement, pollution, and changes in salinity all further threaten the horseshoe crab.

**B. Petitions to List the Horseshoe Crab**

52. Due to the threats to horseshoe crabs and resulting population declines, Friends of Animals submitted a petition to list the horseshoe crab as threatened or endangered under the ESA. The NMFS received this petition on December 21, 2023.

53. On February 27, 2024, NMFS received a second petition from the Center for Biological Diversity to list the horseshoe crab as threatened or endangered under the ESA.

54. The Petitions presented substantial information evidencing that listing of the horseshoe crab may be warranted throughout its range or a significant portion of it because of widespread exploitation by the commercial bait and biomedical industries; threats to its habitat from erosion, coastal development, shoreline alteration, and climate change-associated sea-level rise; and other human factors.

55. The Petitions documented that the International Union for the Conservation of Nature (IUCN) designated the horseshoe crab as "Vulnerable" to extinction in its most recent "Red List" assessment of the horseshoe crab. "Vulnerable" is one of three categories collectively described as "threatened" with extinction.

56. As presented in the Petitions, the IUCN identified six regional populations of horseshoe crabs and documented evidence of regional declines in the form of quantitative analyses. These analyses showed significant population declines in the Gulf of Maine (New Hampshire) and Mid-Atlantic (New England and New York/Connecticut) regions, and negative population trends in the Florida Atlantic and Northeast Gulf of Mexico (west coast of Florida) regions.

57. As presented in the Petitions, the IUCN estimated future reductions of ≥30% of horseshoe crabs in several portions of the species range (decreases of 100% in the Gulf of Maine (New Hampshire), 92% in New England, 55% in the Florida Atlantic, and 32% in the Northeast Gulf of Mexico). The IUCN determined that a greater risk category of "Endangered" is warranted at regional (Gulf of Maine) and sub-regional (New England) levels.

58. The Petitions also presented information on reduced catch of horseshoe crabs per unit effort in Florida (Brockmann *et al*. 2015) and declines in horseshoe crabs and their eggs in South Carolina (Hunt 2022).

59. The Petitions presented evidence that horseshoe crabs in the Yucatán Peninsula may be imperiled.

60. The Petitions presented evidence that immature horseshoe crabs remain at extremely low levels and newly mature female crabs have experienced recent sharp declines in the Delaware Bay.

61. The Petitions presented evidence that male-to-female sex ratios have been increasing over a long period of time despite bans on harvest of female crabs for bait.

62. The Petitions presented evidence that the size distribution of female horseshoe crabs in the Delaware Bay has been shifting to smaller individuals which produce fewer eggs.

63. The Petitions presented evidence that horseshoe crab harvest for bleeding by the biomedical industry, which is increasing over time even though there are synthetic alternatives for the crabs' blood, can result in the death of 30% of bled female crabs, with additional deaths occurring due to industrial handling of the crabs outside of the bleeding process itself.

64. The Petitions provided evidence that bleeding of horseshoe crabs fundamentally alters crab physiology and behavior that is vital to spawning and species survival. Reduced spawning was shown in regions exclusively accessible for biomedical harvest.

65. Corresponding to the negative effects to female horseshoe crabs documented in the Petitions, the Petitions presented scientific information showing that abundance of horseshoe crab eggs in Delaware Bay beaches remains more than 10 times lower than it was before the unregulated harvest of horseshoe crabs in the 1990s.

66. The Petitions presented information demonstrating numerous threats that have driven and continue to drive the horseshoe crab's decline. Under the ESA listing factor of overutilization for commercial and scientific purposes, the Petitions presented evidence that historical overuse of Atlantic horseshoe crabs for fertilizer and livestock feed from the 1850s to the 1920s resulted in steep declines in horseshoe crab populations. This overuse by the fertilizer and livestock industry was followed by declines that began in the 1990s due to exploitation by the commercial bait and biomedical industries.

67. The Petitions also provided information showing that biomedical bleeding of horseshoe crabs causes sublethal effects, including impaired breeding.

68. The Petitions also included evidence of substantial harvest for the marine life fishery in Florida.

69. Under the ESA listing factor of destruction, modification, or curtailment of a species' habitat, the Petitions presented evidence that the horseshoe crab's essential spawning habitat is being lost and continually threatened by erosion, sea-level rise associated with climate change, dredging and deepening of inland waterways and navigation channels, shoreline alteration, and coastal development.

70. Under the ESA listing factor of other manmade or natural factors affecting the species' continued existence, the Petitions provided evidence of threats from the natural factors of slow maturation, high natural mortality of juveniles, and genetic factors. Additional manmade factors documented by the Petitions include climate change, bycatch, impingement on coastal infrastructure, pollution events, and harmful algal blooms. Skewed sex ratios (high male-to-female ratios) were also documented and could be due to either natural or manmade factors, but in either case indicate the threat to the horseshoe crab species inherent in the ongoing harvest of female crabs.

71. Relevant to both the threat of habitat loss and other man-made factors affecting the species' continued existence, the Petitions referenced *NOAA Fisheries Vulnerability Assessment of Fish and Invertebrates to Climate Change on the Northeast U.S. Continental Shelf*. This publication by NMFS itself recognized the threats of climate change to horseshoe crabs and categorized the horseshoe crab's vulnerability to climate change as "very high," its highest vulnerability category.

72. Under the threat of inadequacy of existing regulatory mechanisms, the Petitions' evidence of range-wide and regional declines coupled with a review of state, Atlantic States Marine Fisheries Commission (ASMFC), and Mexican regulatory requirements indicate that regulatory mechanisms are insufficient to ensure the species' survival.

73. The Petitions contained substantial information that horseshoe crabs are threatened by inadequate regulations including the following: (1) regulations only address threats from harvest, leaving other threats unaddressed by regulatory requirements; (2) harvest for biomedical use is largely unlimited; (3) harvest quotas set by the ASMFC are based on a model that significantly overestimates the population of horseshoe crabs; (4) strengthened regulations in one region leads to corresponding increases in harvest rates in other regions; (5) in Mexico, no comprehensive enforcement of the horseshoe crab's endangered status or other national regulations exist for the conservation of horseshoe crabs.

**C. NMFS's Finding on the Petitions**

74. NMFS did not publish a 90-day finding for over 21 months after receiving Friends of Animals' petition to list the horseshoe crab as threatened or endangered; therefore, Friends of Animals sued the agency for failing to meet its deadline. *See* Compl., *Friends of Animals v. Lutnick, et al.*, 1:26-cv-00085-CRC (D.D.C. Jan. 13, 2026). The lawsuit sought declaratory and injunctive relief requiring that NMFS complete a 90-day finding on the petition. *Id*. at 13.

75. Following the filing of this lawsuit, NMFS issued its negative 90-day finding on the Petitions (hereinafter, "Negative 90-Day Finding" or "Finding"). 91 Fed. Reg. 7448 (Feb. 18, 2026).

**1. NMFS applied a heightened standard in making the Negative 90-Day Finding.**

76. Satisfying the low evidentiary threshold for a positive 90-day finding, the Petitions provided substantial information sufficient to lead a reasonable person to believe that listing of the horseshoe crab may be warranted. This should have led to a 12-month status review to determine if listing is warranted. NMFS justified its denial of the Petitions by applying an unlawfully heightened evidentiary standard. It arbitrarily relied on select information favoring its decision, much of it outside the four corners of the Petitions, while discounting, dismissing, disregarding, and ignoring credible and relevant information provided by the Petitions. It also improperly required conclusive proof that listing is warranted due to the impacts of climate change and other factors.

**a. NMFS arbitrarily applied an improperly heightened standard in picking and choosing among scientific sources.**

77. NMFS dismissed much of the Petitions' information sources in favor of its preferred sources, including a heavily relied-on source outside the four corners of the Petitions, the ASMFC 2024 horseshoe crab stock assessment.

78. NMFS dismissed information in the Petitions by claiming that the earlier sources relied on by the Petitions are "obsolete" because newer reports have updated or replaced the information provided in the Petitions.

79. However, the information in NMFS's preferred sources does not replace the information provided in the Petitions.

80. The information on horseshoe crab status in NMFS's preferred sources does not replace the information provided in the Petitions because the Petitions' sources (e.g., the IUCN Red List Assessment/Smith *et al*. 2017, Brockmann *et al.* 2015, and Hunt 2022) include quantitative and empirical data-driven evaluation of the horseshoe crab's populations, while the conclusions in NMFS's preferred sources are (1) qualitative and judgment-based (the IUCN Green Status Assessment/Smith *et al.* 2023) or (2) incomplete (ASMFC's stock assessments).

81. The Finding relied on the Green Status Assessment to claim that the Red List Assessment is obsolete.

82. As stated by the authors of the Green Status Assessment, this assessment was developed "to complement" the Red List Assessment.

83. Therefore, the Green Status Assessment does not replace or update the Red List Assessment.

84. Moreover, the Green Status Assessment's qualitative conclusions do not reasonably supersede the Red List Assessment's quantitative, empirical data-driven analysis.

85. Even though the Green Status Assessment qualitatively assigned the Eastern Gulf: Florida Southwest and Eastern Gulf: Florida West spatial units "functional" and "viable" current statuses, respectively, its authors identified evidence that those populations are declining, consistent with the Red List Assessment.

86. Even though the Green Status Assessment qualitatively assigned a current status of "functional" to the Northern Gulf of Maine spatial unit, it does not explain if or why

the significant declines within that region identified by the Red List Assessment are no longer happening or of concern.

87. The Finding also relied on the ASMFC's stock assessments for the horseshoe crab to claim that the Petitions' sources are obsolete.

88. The ASMFC's horseshoe crab stock assessments do not replace or supersede the quantitative and empirical findings presented in the Petitions.

89. Within Delaware Bay, the ASMFC's stock assessments rely on modeling which does not account for the severely depleted (over 90%) horseshoe crab egg densities in Delaware Bay, information that was presented in the Petitions.

90. The information from ASMFC's stock assessments on which the Finding relies for horseshoe crab regional population statuses is also incomplete. For each stock assessment, the Finding only presents stock status based on the percentage of surveys within a region having a >50% estimated probability that the most recent year's survey value had dropped below the numbers of horseshoe crabs present in 1998. Importantly, 1998 was either the highest or second highest year, depending on information source, for bait harvest of horseshoe crabs, and so the numbers of horseshoe crabs at this reference point in time were near their lowest recorded. Consistent with this, the ASMFC states that this reference point should **not** be "viewed as a biological reference point for determining overfished status."

91. Using only this 1998-based benchmark, as the Negative 90-Day Finding did, a population would be deemed to be in "Good" status even if each of a region's most recent surveys indicated numbers of crabs as low as those in 1998, and even if surveys prior to the most recent showed numbers of crabs decreasing each year up until that point.

Moreover, the results of many surveys are not included in this reference point-based stock assessment by ASMFC, as many do not have data as far back as 1998.

92. These incomplete stock assessments do not replace the information presented in the Petitions. However, the Finding relied on these benchmark-based assessments to dismiss the reports provided by the Petitions indicating the imperiled status of the horseshoe crab.

93. Even using the benchmark of whether numbers of horseshoe crabs in the most recent year's survey are likely to be lower than they were in 1998, the Northeast/New England horseshoe crab population fell short of it in both the 2019 and 2024 ASMFC stock assessments, as half of the surveys for that sub-region indicated that the numbers of crabs were likely even lower than the depleted levels in 1998. Nevertheless, the Finding used these stock assessments to dismiss the reported declines in New England horseshoe crab populations presented in the Petitions.

94. The Finding also chose the ASMFC's post-biomedical bleeding mortality rate of 15% over the credible scientific study (Leschen and Correia 2010) cited by the Petitions and carried out in conjunction with a biomedical company, that demonstrated a 30% mortality rate in bled female horseshoe crabs. NMFS did not determine that the study presented by the Petitions (Leschen and Correia 2010) was unreliable or irrelevant.

95. In summary, NMFS applied an improperly heightened standard of review akin to that appropriate for a 12-month finding by choosing its favored information sources, including sources outside those presented in the Petitions. It also arbitrarily claimed that the horseshoe crab population trends reported by the Petitions' sources are

obsolete, when NMFS's sources did not replace or supersede the Petitions' information sources.

96. By arbitrarily picking and choosing among scientific sources, NMFS unlawfully dismissed the Petitions' credible and relevant information on which a reasonable person could rely in finding that listing of the horseshoe crab may be warranted.

**b. NMFS applied an improperly heightened standard by discounting, disregarding, and ignoring substantial information.**

97. The Finding discounted or disregarded multiple reports cited in the Petitions on sublethal effects of biomedical bleeding on horseshoe crabs, including reduced spawning, even though NMFS did not determine that the information therein was incorrect, unreliable, or otherwise irrelevant to the requested action.

98. In the Finding, NMFS discounted an empirical study (Anderson *et al.* 2013) because of the stressful treatment conditions applied and because it did not follow the best management practices developed by the ASMFC and biomedical industry.

99. The stressors were applied by Anderson *et al*. to simulate those involved in the biomedical bleeding process.

100. The best management practices that NMFS alleges are "used by biomedical facilities pursuant to the licensing requirements of the Food and Drug Administration (FDA)" are, in fact, voluntary and not enforced. There is no evidence that these best management practices are uniformly or routinely followed.

101. NMFS also discounted Anderson *et al*. 2013 because one treatment group did not have access to food post-bleeding.

102. However, crabs are deprived of food during various stages of the bleeding process, especially when held in ponds for weeks at a time, and the treatment group with access to food experienced significant and weeks-long behavioral and physiological changes relevant to successful spawning and foraging.

103. NMFS also disregarded other information on sublethal effects included in the Petitions. While the Finding acknowledged reviews cited by the Petitions for information on sublethal effects, it only considered one empirical study (Anderson *et al*. 2013) that those reviews discuss. NMFS did not consider other studies that found sublethal effects beyond what Anderson *et al*. 2013 found, including behavioral, physiological, and population-level effects of bleeding or conditions relevant to bleeding procedures.

104. The Finding discounted the results of a study on drastically reduced horseshoe crab egg densities (Smith *et al*. 2022) based on recent slight increases that the authors reported.

105. However, according to the authors, these increases "do not approach the levels observed" historically, and a reanalysis of the data which accounted for changes in survey methodology over time (Shoemaker 2023) resulted in these modest increases disappearing.

106. The Finding made no mention of the information provided in the Petitions on reduced female body size.

107. Coupled with the fact, presented in the Petitions, that the number of eggs that females lay largely depends on body size, this evidence on female body size is relevant because of the importance of females to the species' population dynamics, and therefore, its risk of extinction.

108. The Finding did not consider information in the Petitions showing that the recruitment of immature male and female crabs remains extremely low in Delaware Bay, and unchanged since the prohibition on harvest of female crabs for bait.

109. The Petitions provided information about the threat of erosion to the horseshoe crabs' habitat, including in the context of climate change. However, the Finding made no mention of this threat to the horseshoe crab's spawning habitat.

110. In summary, even when not arbitrarily picking favored information sources over those provided in the Petitions, the Finding discounted, disregarded, and ignored credible scientific information indicating multiple threats to horseshoe crabs as well as imperilment of the crabs' populations, all of which could lead a reasonable person to conclude that the species may warrant listing.

**c. NMFS applied an improperly stringent evidentiary standard by requiring conclusive scientific proof that listing is warranted due to specific factors, including the threat of climate change.**

111. The Petitions included information on increasingly skewed sex ratios (high male-to-female ratios) in horseshoe crab populations.

112. The Finding dismissed this information on the basis that the skewed ratios were not conclusively linked to overharvest of females and that increasing numbers of males "can be an early sign of a growing population."

113. The Petitions presented data on drastically reduced newly mature female crabs in the Delaware Bay.

114. The Finding dismissed this data as mere variation among life stages that does not "necessarily" indicate a declining population.

115. The Petitions provided information on the threats of climate change and associated sea-level rise and erosion to the horseshoe crab's habitat. For example, NMFS's own assessment of the vulnerability of horseshoe crabs to climate change, *NOAA Fisheries Vulnerability Assessment of Fish and Invertebrates to Climate Change on the Northeast U.S. Continental Shelf*, found a "very high" likelihood of adverse impacts of climate change on the productivity and abundance of horseshoe crabs.

116. The Finding discounted this vulnerability assessment because it "does not provide details on the likely magnitude of climate-related impacts . . . nor does it provide information related to the species' extinction risk as a result of this stressor."

117. NMFS then relied on the possibility that the horseshoe crab species could adapt to changing conditions and use new habitats to conclude that listing could not be warranted due to the uncertainty remaining regarding impacts of climate change.

118. A positive 90-day finding must be made if a petition contains substantial information indicating that the petitioned action **may** be warranted; therefore, NMFS applied an improperly heightened standard in requiring conclusive evidence establishing the need for listing at the 90-day finding stage.

119. Moreover, as even a 12-month finding is based on the best **available** evidence, 16 U.S.C. § 1533(b)(1)(A), denying the Petitions because they do not meet a heightened standard of certainty was inconsistent with the lower evidentiary threshold set forth in the ESA for a 90-day finding. In applying such a heightened standard, NMFS relied on factors which Congress did not intend it to consider, rendering the Finding arbitrary, capricious, and contrary to law.

### 2. NMFS arbitrarily made conclusions counter to the evidence.

#### a. NMFS made conclusions unsupported by, and counter to, the evidence before it.

120. The Finding concludes, based on ASMFC's regional trend analysis, that Delaware Bay and the Southeast regional populations are "Good/Increasing." The underlying analysis in the ASMFC's stock assessments only evaluated whether a region, based on the most recent year's surveys, had likely experienced declines below the severely reduced 1998 levels. Therefore, a negative answer to this question cannot, on its own, support a conclusion of "Increasing," as this would also be the assigned conclusion for a regional population that is currently declining, even to depleted levels close or equal to those in 1998.

121. The Finding used inconsistent data when presenting 24 years of spawning abundance in Delaware Bay. It compared seasonal estimates in later years to single day peak estimates in earlier years to present what appears to be an increase in spawning abundance over the 24 years. It then concluded that "a reasonable person conducting an impartial scientific review would not conclude that there is a decrease in . . . abundance of spawning Atlantic [horseshoe crabs] in the Delaware Bay."

122. If one makes defensible comparisons between single day peak estimates, this reveals that current spawning levels in Delaware Bay remain at reduced levels similar to those observed during the height of the bait harvest.

123. Horseshoe crab egg densities in Delaware Bay have been demonstrated to be reduced by more than 10-fold since the 1980s.

124. Nonetheless, the Finding concluded that "a reasonable person conducting an impartial scientific review would not conclude that there is a decrease in egg densities" in Delaware Bay.

125. The Finding stated that the Green Status Assessment/Smith *et al*. 2023 described the most likely long-term future status for each of the east and west coast spatial units in Florida as "viable."

126. In fact, Smith *et al*. 2023 expected that the Florida Atlantic: Florida South population, which spans both the east and west coasts of Florida, will be merely "present," which is a population that "occurs in the wild but is threatened, or near threatened, and declining."

127. These statements and conclusions in the Finding regarding regional population trends, the abundance of spawning horseshoe crabs, horseshoe crab egg densities, and the expected future status for the east and west coast spatial units in Florida were unsupported by, or counter to, the evidence before NMFS. As these statements and conclusions were used to support NMFS's Negative 90-Day Finding, the agency's decision was arbitrary, capricious, and contrary to law.

**b. NMFS arbitrarily cherry-picked information within its favored sources to come to conclusions counter to other information within those sources.**

128. Even after discounting the Petitions' information sources and choosing its own favored sources, NMFS used select information in those preferred sources to support its conclusion that listing could not be warranted, while ignoring information that did not support its conclusion.

129. In favoring the IUCN Green Status Assessment over the Red List Assessment, the Finding largely paid no attention to the Green Status Assessment's primary focus: the horseshoe crab's expected future status. As stated by the authors of the Green Status Assessment, "[t]his analysis of expected future status helps identify the conservation actions that are **most likely to reverse declines** and promote species recovery." (emphasis added).

130. The Green Status Assessment projected that the status of the species would decline in some spatial units. The Finding did not take this information into account.

131. Most of the more optimistic projections in the Green Status Assessment depended on uncertain future conservation measures, including habitat conservation measures that have not been implemented or formalized.

132. The Green Status Assessment concluded that, without additional conservation, additional populations are likely to decline. The Finding failed to take this into account.

133. NMFS relied on the extra-petition 2024 stock assessment of the ASMFC, specifically its modeled increases in abundance of total mature crabs, to discount information in the Petitions showing a sharp two-year decline in newly mature females as indicated by the Virginia Tech Delaware Bay Trawl Survey (Hallerman and Jiao 2021). It suggested this decline could be mere variation among life stages over time. However, in doing so, it did not consider data in that stock assessment demonstrating that severely reduced levels of newly mature females continued, raising further concern for long-term population viability.

134. NMFS relied on the extra-petition 2024 stock assessment of the ASMFC, solely the assessment's 1998 benchmark-based analysis, to dismiss information in the Petitions (Hunt 2022) documenting declines in horseshoe crab populations in South Carolina. This dismissal was based on a claim that the information on South Carolina populations in Hunt 2022 was not representative of the Southeast regional population as a whole.

135. However, in making this claim, NMFS failed to consider trend data in the same 2024 stock assessment showing decreasing populations throughout the Southeast, including South Carolina, Georgia, and Florida, consistent with the information that NMFS dismissed as not representative.

136. In defending its choice of ASMFC's biomedical mortality rate of 15% over the Petitions' information from Leschen and Correia 2010 (mortality rate of 30%), NMFS used select data from some of its preferred sources, making no mention of results in the preferred studies that are at odds with its favored information.

137. Hurton and Berkson 2006 showed that 29.4% of female horseshoe crabs died after having 40% of their blood drained. Data from Owings *et al*. 2020 show that 40% of horseshoe crabs died under a treatment simulating the full effects of the bleeding procedure, with 59% dying in the year that only female crabs were bled. These results are similar to those of Leschen and Correia 2010, belying NMFS's contention that the Petitions "only addressed the studies with the highest post-bleeding mortality rates."

138. While the Finding also relied on the extra-petition 2024 stock assessment of the ASMFC, and studies evaluated therein, to support its choice of the ASMFC's 15% mortality rate from biomedical bleeding, it ignored additional studies discussed by that

assessment that demonstrated sublethal effects of bleeding, another threat NMFS disregarded. Those sublethal effects included impaired movement toward spawning beaches (Owings *et al*. 2019) and a 50% reduction in spawning attempts by females (Watson II *et al*. 2022).

**3. NMFS unlawfully relied on information outside the four corners of the Petitions, including information produced after the Petitions were submitted.**

139. The ESA required NMFS to make its 90-Day Finding based on the information presented in the Petitions. 16 U.S.C. § 1533(b)(3)(A).

140. NMFS provided notice of the Petitions, via letter, to the states of Alabama, Connecticut, Delaware, Florida, Georgia, Louisiana, Massachusetts, Maryland, Maine, Mississippi, New Hampshire, North Carolina, New Jersey, New York, Pennsylvania, Rhode Island, South Carolina, and Virginia, and the District of Columbia.

141. NMFS did not send similar letters to other entities.

142. In its Finding, NMFS relied on third-party materials that were not included in the Petitions, including reports by the ASMFC (e.g., ASMFC's 2024 horseshoe crab stock assessment and ASMFC's 2024 review of the 2023 fishing year) and compliance reports that states submitted to ASMFC after the Petitions were filed.

143. NMFS relied on multiple third-party documents on the impacts of biomedical bleeding, and its analysis of those reports, to draw its own conclusions regarding such impacts, even though impacts of bleeding are a subject of dispute among reasonable scientists.

144. NMFS's use of materials produced after the Petitions were submitted resulted in its reliance on information that Friends of Animals did not have the opportunity to address during the initial petition process.

145. By relying on extra-petition sources of information on horseshoe crab populations and the impacts of biomedical bleeding to make its Negative 90-Day Finding, Friends of Animals did not have the opportunity to address those materials or NMFS's analyses of those materials.

146. Such an opportunity should come at the 12-month status review stage, when Friends of Animals would be able to address all third-party materials collected by NMFS. Cutting off this opportunity by relying on its own selected sources at the 90-day stage of review bypassed the appropriate procedures under the ESA.

147. In relying on materials outside the four corners of the Petitions, including materials produced after the Petitions were filed, NMFS acted outside the scope of its authority under the ESA and conducted the type of research and investigation reserved for a 12-month status review. As such, NMFS failed to observe procedure required by law and relied on factors which Congress did not intend it to consider, rendering it arbitrary, capricious, and an abuse of discretion under the APA. 5 U.S.C. § 706(2)(A).

**4. NMFS arbitrarily and capriciously determined that the horseshoe crab is not threatened or endangered throughout a significant portion of its range.**

**a. NMFS failed to consider whether genetically distinct portions of the horseshoe crab's range may be significant.**

148. The Petitions contained substantial information showing that listing the horseshoe crab may be warranted throughout a significant portion of its range.

149. Among the information included in the Petitions are the survey data-driven

findings of the IUCN's Red List Assessment of the horseshoe crab, which demonstrated significant declines in the Gulf of Maine and Mid-Atlantic regional populations, the latter including the Mid-Atlantic New England and New York sub-regional populations, and declining trends in the Florida Atlantic and Florida Gulf Coast regions.

150. The Petitions also contained information indicating the imperiled status of horseshoe crab populations in Massachusetts, New York, Maryland, Delaware Bay, South Carolina, Florida, and the Yucatán Peninsula in Mexico.

151. The Petitions presented substantial scientific data demonstrating that regional and sub-regional populations may, individually or in combination, be significant portions of the range. In particular, the Petitions showed that each have distinct genetics corresponding to morphological and behavioral variations. As such, these distinct lineages may be essential for the species' adaptive potential in the face of ongoing environmental change.

152. The Petitions included scientific information demonstrating major "zones of genetic discontinuity" between the Southeast and Florida Atlantic regions, the Florida Atlantic and Florida Gulf Coast regions, and the Florida Gulf Coast and Yucatán Peninsula regions, as well as additional significant zones of genetic discontinuity between other regions and sub-regions.

153. As described in paragraphs 76–119 above, NMFS discounted this information in favor of the IUCN's Green Status Assessment and incomplete information from stock assessment reports created by the ASMFC even though these later publications did not supersede or invalidate the information presented in the Petitions.

154. Because NMFS discounted, dismissed, disregarded, or ignored the

information provided in the Petitions indicating that these populations may warrant listing, the Finding did not consider whether any of the populations delineated by these zones of genetic discontinuity, individually or in combination, may be significant portions of the range.

155. In reviewing the genetic evidence presented by the Petitions, the Finding focused primarily on the populations located at the geographic extremes of the horseshoe crab's range, those being the Gulf of Maine and Yucatán Peninsula regional populations, as these are the most genetically distinct.

156. However, NMFS still did not consider whether these populations at the range's extremities, alone or together, may constitute a significant portion of the range for the purposes of the ESA.

157. In summary, by arbitrarily discounting, dismissing, disregarding, and ignoring the scientific information presented in the Petitions on horseshoe crab population declines and associated threats, NMFS failed to evaluate whether genetically, morphologically, and behaviorally distinct regional or subregional populations, individually or in combination, may constitute one or more significant portions of the horseshoe crab's range. This renders the Finding arbitrary, capricious, and contrary to the ESA.

**b. NMFS failed to consider evidence in the Petitions when it concluded that the Petitions provided no information to suggest that the New York population may be a significant portion of the horseshoe crab's range.**

158. The Finding acknowledged that the Mid-Atlantic: New York population is in poor status but concluded that the Petitions provided no evidence to suggest that the Mid-Atlantic: New York population may be a significant portion of the species' range.

159. In reaching this conclusion, NMFS did not consider information presented in

the Petitions showing that this population can use a broader array of substrates for nesting and spawning compared to other populations, and the importance of appropriate substrate availability to egg cluster abundance.

160. By failing to consider this evidence regarding the Mid-Atlantic: New York population, which may represent adaptive potential for the horseshoe crab species, especially in the context of climate change and associated sea-level rise, NMFS offered an explanation that ran counter to the evidence before it and failed to consider an important aspect of the problem. This renders NMFS's determination that the horseshoe crab is not threatened or endangered throughout a significant portion of its range arbitrary, capricious, and not in accordance with the ESA.

**FIRST CLAIM FOR RELIEF**

**(ESA/APA)**

**NMFS's Negative 90-Day Finding is arbitrary, capricious, contrary to law and without observance of procedure required by law.**

161. Friends of Animals herein incorporates all information and allegations contained in the preceding paragraphs.

162. NMFS is required, to the maximum extent practicable within 90 days, to "make a finding as to whether **the petition** presents substantial scientific or commercial information indicating that the petitioned action **may be** warranted." 16 U.S.C. § 1533(b)(3)(A) (emphasis added).

163. A petition is deemed to contain "substantial scientific or commercial information" if it contains "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review

would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i)

164. The Negative 90-Day Finding violated the ESA because it was arbitrary, capricious, contrary to law, and without observance of procedure required by law. The agency (1) arbitrarily applied an improperly heightened evidentiary standard, including by cherry-picking among scientific sources and information, arbitrarily discounting, dismissing, disregarding, or ignoring substantial information in the Petitions, and requiring conclusive scientific proof that listing is warranted; (2) made conclusions counter to the evidence; and (3) relied on information outside the four corners of the Petitions, including information that post-dated the Petitions. NMFS effectively bypassed the 90-day review stage and engaged in a 12-month review but did so arbitrarily and without the requisite public participation procedures.

**SECOND CLAIM FOR RELIEF**

**(ESA/APA)**

**NMFS's Negative 90-Day Finding that the Petitions did not present substantial information indicating that the horseshoe crab may be threatened or endangered in a significant portion of its range is arbitrary, capricious, and contrary to law.**

165. Friends of Animals herein incorporates all information and allegations contained in the preceding paragraphs.

166. The ESA defines a species as "endangered" if that species is "in danger of extinction throughout all **<u>or a significant portion of its range</u>**" and a species as "threatened" if the species is "likely to become an endangered species within the foreseeable future throughout all **<u>or a significant portion of its range</u>**." 16 U.S.C. §§ 1532(6), (20) (emphases added).

167. Accordingly, NMFS was required to determine whether there are any significant portions of the horseshoe crab's range for which the Petitions contained substantial information indicating that listing the horseshoe crab as threatened or endangered may be warranted.

168. NMFS failed to consider whether any of the genetically distinct portions of the range, corresponding to the regional populations identified in the Petitions, individually or in combination, were significant portions of the horseshoe crab's range because it arbitrarily and unlawfully found that listing could not be warranted in any of those portions. This failure was, therefore, arbitrary, capricious, and contrary to law.

169. Even though the Finding acknowledged that the Mid-Atlantic: New York population is in poor status, it concluded that the Petitions provided "no information . . . to suggest that the New York regional population is a significant portion of the species' range." This conclusion was arbitrary and capricious and contrary to law because in making it, NMFS failed to consider relevant information provided by the Petitions and so failed to consider an important aspect of the problem.

**REQUEST FOR RELIEF**

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

1. Declare that NMFS violated the ESA and APA in issuing the Negative 90-Day Finding on the Petitions to list the horseshoe crab as threatened or endangered;
2. Vacate NMFS's Negative 90-Day Finding;

3. Order NMFS to initiate a full 12-month status review, or alternatively, order NMFS to issue a new 90-day finding by a date certain;
4. Retain jurisdiction to ensure compliance with all judgments and orders;
5. Award Friends of Animals its costs of litigation, including reasonable attorneys' fees under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(4); and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and
6. Grant Friends of Animals such other relief as the Court deems just and proper.

Dated: October 28, 2026

Respectfully Submitted,

/s/ Melissa W. McCoy
Melissa W. McCoy (DC Bar # CO00138)
Friends of Animals
Wildlife Law Program
6041 S. Syracuse Way, Suite 250
Greenwood Village, CO 80111
(720) 945-9453
melissa@friendsofanimals.org

/s/ Jennifer Best
Jennifer Best (DC Bar # CO00056)
Friends of Animals
Wildlife Law Program
6041 S. Syracuse Way, Suite 250
Greenwood Village, CO 80111
(720) 945-9453
jennifer@friendsofanimals.org